## Carrigan v. Kurtz et al.

(Decided Nov. 9, 1938.)

WEBB & WEBB for appellant.

HESTER & STAHR for appellees.

Opinion of the Court by Judge Cammack—Reversing.

Appellant, Caroline D. Carrigan, sought to restrain appellee John Kurtz from continuing to use a roadway which he had opened across her property in the summer of 1936 to reach a ferry landing, and to recover damages for the opening of the roadway. Kurtz filed an answer, setoff, counterclaim and cross petition, claiming that the roadway in question was a public passway, and that he had sustained damages from appellant's efforts to stop persons from using same. The part of Kurtz's answer claiming damages was stricken, and by agreement of the parties it was ordered that the material affirmative allegations of the appellee's answer be controverted of record. Fulton county filed an intervening petition asking to be made a party defendant to the action because of the county's interest in the matters involved. After proof was heard, judgment was entered dismissing appellant's petition, and adjudging that appellee Kurtz was entitled to the passway in question over the land of appellant. Appellant was given the right and privilege to keep and maintain gates across the passway where fences were maintained by her, to all of which she objected and excepted and prayed an appeal to this Court, which was granted. Appellee objected and excepted to that part of the judgment that permitted the maintenance of gates, and prayed an appeal to this Court, which was granted. Only Caroline Carrigan appeals.

Since the facts in this suit are somewhat involved, and, since it has long been held by this Court that disputes over passways must be determined largely upon the facts pertaining to each case, it is necessary to review briefly the history of the conditions leading up to this dispute. Stephens v. Hamblin, 195 Ky. 428, 242 S. W. 597; Evans v. Bullock, 260 Ky. 214, 84 S. W. (2d) 26, and cases cited in each case. For a number of years Caroline (Carrie) Carrigan has owned a tract of several hundred acres of land in the northern part of the section of Fulton County, Kentucky, known as the Madrid Bend section. To reach this part of Fulton county without going into the state of Tennessee, it is necessary to cross the Mississippi River, go across a small section of the state of Missouri, and again cross the Mississippi River. A large part of the land in the Madrid Bend area is overflowed by the Mississippi River during flood periods. New Madrid, Missouri, is north across the

Mississippi River from the point of the Madrid Bend section, known as Kentucky Point.

During this century there have been frequent cave-ins of the banks of the Mississippi River on the Kentucky side. There have also been overflows during which sand was deposited on the bottom lands making them unsuitable for cultivation. For these reasons, and probably others, the upper part of the Madrid Bend territory is much more sparsely peopled now than in former years. Formerly, a principal outlet for the residents of the upper part of this area was across the Mississippi River to New Madrid, Missouri.

It was not until 1930 that the Kentucky State Highway Department built a hard road through the Madrid Bend section. This road runs up through the middle of the area almost due north and south following the route of an old wagon road. It is quite probable that, prior to the building of the highway, when travel was possible in the upper part of the Madrid Bend area, persons traveled by any available means and route. As has happened in so many river sections of Kentucky, the diminishing of river traffic and the building of a highway changed greatly the methods and direction of travel. The general and most frequently used outlet now for the Madrid Bend area is the highway south into Tennessee. One witness testified that, whereas he formerly received his mail at New Madrid, Missouri, he now goes south to Tiptonsville, Tennessee, for it.

The point where the old road met the river, which is the point where the new road now meets it, was reasonably accessible to the ferry to New Madrid. Since 1930, the ferry, when in operation, has landed at the foot of the new highway part of the time. However, several ferry landings were used in former years. These landings ranged from a point above the highway landing to the east down the river west approximately three to four miles. The use of the landings has depended upon the state of the river and the shifting of sand and mud deposits along the Kentucky bank.

There does not appear to have been any flourishing ferry business in this section, but rather, until recent years, some person operating a ferry, perhaps primarily for his own use, carried passengers and freight back and forth to New Madrid. At times more than one ferry

was in operation. Those using a ferry went from the main road to the landing by such route as was then useable. There is no question but that at the times when the lower landings (west of the highway) were in use appellant's land was crossed. Furthermore, when there were houses in the vicinity of the west landings, passways and log roads were used in going to and from them to the principal road where the highway is now located. There is evidence to the effect that, prior to 1908, there was a reasonably well defined passway running near the river bank. A good portion of this passway seems to have caved in during that year, however, and appellant insists, and her testimony is supported by that of others who know the section, that the principal outlet for the persons living west of the main road was back away from the river through the woodland after that time. Other witnesses testified, however, that most of the travel was nearer the river.

Appellee started in the ferry business about 1925, but it was not until 1933 that he secured a franchise to operate his ferry. Appellee seems to have paid a fee to the owner of the land on the Kentucky side of the river where he made his landings, except when landing at the highway landing. One witness testified that he had rented a landing to appellee east of the highway. Appellant testified that appellee had paid her a fee for landing his ferry at a landing west of the highway (500 or 600 feet) until shortly before this dispute arose. In 1936, appellee made arrangements with Mrs. Ruth Carrigan, who owned land west of the land of appellant, for a landing place on her land. This point is approximately a mile and a quarter down the river from the highway ferry landing. Appellee entered upon the land of appellant without her permission, cut a fence along the highway, erected a gate and proceeded to open up a passway through appellant's land toward the ferry landing recently established on the land of Ruth Carrigan. There is little evidence to the effect that, in recent years, a ferry landing had been used at the point where appellant began landing his ferry on the land of Ruth Carrigan.

Appellee insists that for more than 30 years there had been a public passway over the route where he opened the road. He stated that he cut branches from trees, dragged trees out of the way and filled in sloughs.

Several witnesses testified that virtually the same route followed by appellant had been used as a passway in former years. Others testified, however, that part of the route followed by appellee had never been used as a passway and that the portion which had been used had been used for logging purposes.

At this point, it is interesting to note that no resident on the Kentucky side of the Mississippi River is insisting that this claimed passway remain open. Appellee has no basis whatever for insisting that he has any private right to use the passway in dispute or any other one through appellant's land because he had been in the ferry business for only eleven years at the time this dispute arose, and during eight years of that time he was operating without a franchise. When he had landed his ferry on land owned by appellant he had paid a fee for the privilege of so doing, according to her testimony, and the route followed to get to that point, with the possible exception of a few hundred feet, was not the route he opened up to get to the landing on the property of Ruth Carrigan.

The question narrows down to whether or not appellee, under the facts peculiar to this case, had a right to enter upon the land of appellant, cut a fence, erect a gate and open up a public road to a ferry landing approximately a mile and a quarter down the river from the highway ferry landing, for his own private gain, and with added burden on appellant, and be justified in so doing on his assertion that the public had gained the right to use the passway by adverse use for more than fifteen years. We think not. It is significant that no witness on either side testified that, before appellee entered upon appellant's land to open up a road, objection had been raised to their passing over appellant's land. On the other hand, there is strong indication that the use of the various passways through appellant's woodland and pasture land was more in the nature of a permissive use. Since the building of the highway, traffic and community interest of the Madrid Bend section have been directed largely to the south toward Tennessee. While the record is not clear on the point, it is probable that the ferry business of appellee, a resident of New Madrid, Missouri, has been more in the nature of through traffic rather than local business as in former years. It is our conclusion that the facts in this case

are not such as would warrant appellee to rely upon the passing over appellant's land, largely by neighbors and residents of the Madrid Bend area, in maintaining his claim to a passway to the ferry landing located on the land of Ruth Carrigan in 1936. There is no proof that this is the only landing that can be used during the low stages of the Mississippi River.

Judgment reversed with directions to set it aside and for proceedings consistent with this opinion.